**BEAR, STEARNS FUNDING, INC.,**
Plaintiff and Counterclaim
Defendant,

v.

**INTERFACE GROUP–NEVADA, INC.,**
Defendant and Counterclaim
Plaintiff.

No. 03 Civ. 8259(CSH).

United States District Court,
S.D. New York.

March 21, 2005.

Cadwalder, Wickersham & Taft LLP, Jonathan D. Polkes, Esq., Michael M. Gordon, Esq., Of Counsel, New York, NY, for Plaintiff.

Wasserman, Grubin & Rogers, LLP, Richard Wasserman, Esq., Of Counsel, New York, NY, for Defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This diversity case is before the Court on the motion of plaintiff and counterclaim defendant Bear, Stearns Funding, Inc., ("Bear Stearns")[1] for summary judgment on its claim for breach of contract and to dismiss the Third through Sixth Counterclaims of defendant and counterclaim plaintiff Interface Group—Nevada, Inc. ("Interface").[2]

## I. BACKGROUND

Bear Stearns is in the business, among other things, of extending credit to clients, secured by a lien on real property. Bear Stearns then treats the loan as a commodity and sells, sells participations in, securitizes, or otherwise transfers its interest in those loans to third parties or into capital markets.[3] Interface is the wholly owned subsidiary of a holding company, of which Sheldon G. Adelson is the sole shareholder. Adelson is also the Chairman of Interface's Board. Interface owns and operates the Sands Expo Center, located in Las Vegas, Nevada, the largest privately owned convention center in the United States. Through his corporate affiliates, Adelson—who has been called, not pejoratively, a Las Vegas' "mogul"—also owns the Venetian Resort Hotel Casino which is physically attached to the Sands. Christopher Palmeri, *A Vegas Mogul Cashes in on Some Chips,* BUS. WK., December 13, 2004, at 14.

On June 28, 2001, Bear Stearns entered into an agreement (the "Loan Agreement") with Interface. Pursuant to the Loan Agreement, Bear Stearns loaned Interface $141 million secured by a mortgage encumbering the Sands Expo Center. The Loan Agreement contains provisions enabling Bear Stearns to assign or securitize all or part of the loan. Specifically, § 9.1 of the agreement, entitled "Sale of Notes and Securitization," authorizes Bear Stearns to:

> sell all or any portion of the Loan and the Loan Documents, or issue one (1) or more participations therein, or consummate one (1) or more private or public securitizations of rated single- or multiclass securities ("the Securities") secured by or evidencing ownership interests in all or any portion of the Loan and the Loan Documents or a pool of assets that include the Loan and the

1. Bear Stearns is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

2. Interface is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in the State of Nevada.

3. When all or part of a loan is securitized, the loan is packaged with other loans, and securities are sold in the capital market. The repayment of these securities depends on cash flows from the loans. When all or part of a loan is sold—through sales and participations, respectively—the purchaser assumes both the benefits (e.g. interest repayments) and the risks (e.g. the possibility of default) of the loan. Securitization disperses the credit risk of the loan to capital market participants, where sale merely transfers the benefits and risk to the purchaser of the loan.

Loan Documents (such sales, participations, and/or securitizations, collectively a "Securitization").

However, Bear Stearns' right to sell or assign the loan is not unlimited. Section 10.24, entitled "Limitations on Lender's Assignment," prohibits Bear Stearns from assigning all or part of the loan to a "Competitor" of Interface (the "competitor limitation"):

Unless an Event of Default shall then exist, Lender shall not consummate an assignment or participation to any person that then (i) owns or operates (or is an Affiliate of a Person that owns or operates) a casino that is located in the State of Nevada or the State of New Jersey, (ii) owns or operates [ (]or is an Affiliate of a Person that owns or operates) a Competing Facility and/or (iii) is a union pension fund (any such Person, a 'Competitor') . . . .

Though the competitor limitation restricts Bear Stearns' right to sell or assign the loan to a competitor, it does "not apply to a Securitization of the Loan," as "Securitization" is defined in § 9.1, above (the "securitization exemption"). Specifically, § 10.24 provides that the competitor limitation "shall not apply to a Securitization of the Loan and shall be void and of no further force and effect after a Securitization of the Loan."

The rationale behind the Loan Agreement's exemption of securitizations from the competitor limitation is offered in the affidavit of Interface's president, Richard Heller.

If Bear Stearns entered into a securitization transaction—a transaction in which part of the loan was combined with other loans, packaged, and sold on Wall Street, much the way stock in General Motors might be sold—we recognized that, once this "security" was trading in the marketplace, it would be impossible to identify the owners of small individual shares or pieces. That would be a very different situation, however, from the sale of a single, large piece, of the loan to an identifiable entity that, either directly or indirectly through an affiliate, was a competitor who would be in a situation to make use of our information and, equally important, through holding a significant part of our debt, potentially exert an influence over our operations.

Heller Aff., ¶ 8. Moreover, as described above, in addition to exempting securitizations from the competitor limitation, § 10.24 also provides that the competitor limitation is of no further force and effect after a securitization.

To recapitulate: Bear Stearns has the right to sell or securitize the $141 million loan. If Bear Sterns *sells* the loan, it is prohibited by the competitor limitation from selling any portion of the loan to a competitor of Interface. However, if Bear Stearns *securitizes* the loan, the securitization exemption allows it to sell those securities to any party, including competitors of Interface, and once the securitization is complete, the exemption provides that the competitor limitation is of no further effect.

The Loan Agreement also contains a provision, § 10.25, which obliges Bear Stearns to protect the financial information of Sheldon G. Adelson and to use "commercially reasonable efforts" to require that confidentiality agreements be signed prior to the release of such information to third parties. Section 10.25 contains language, similar to the securitization exemption language in § 10.24, which discharges Bear Stearns' confidentiality obligations "in connection with a Securitization."

On August 1, 2002, Bear Stearns securitized a portion of the loan, but left $34,401,788 out of the securitization. This unsecuritized portion of the loan is known as the "subordinate component," and the

circumstances of its disposition form the grounds for this action. Subsequently, on August 13, 2002, the parties entered into another agreement, the "Revised [4] Sharing Agreement." The Revised Sharing Agreement was apparently consummated in anticipation of Bear Stearns' sale of the subordinate component of the loan to a third party, Beal Capital Markets ("Beal"). The Revised Sharing Agreement provides that Interface is required to pay Bear Stearns for the "costs of Securitzation" [5] and sets forth a formula based on actual and estimated costs, pursuant to which the payment will be calculated. It also provides that if the sale to Beal is successful, Bear Stearns would require Beal to sign agreements not to transfer Beal's interest in the loan to a competitor of Interface. If the sale to Beal is unsuccessful, Bear Stearns is required by the Revised Sharing Agreement to "use diligent efforts to market and sell the Subordinate Component subject to the Subordinate Component Restriction." Compl., Ex. 2.

For reasons neither disclosed by the parties nor relevant to this motion, the sale of the subordinate component of the loan to Beal was never consummated. In July 2003, however, Bear Stearns did sell the subordinate component of the loan to another entity, SOF–IV Bond Corporation ("SOF–IV") and, pursuant to the formula contained in the Revised Sharing Agreement, demanded payment from Interface of $1,477,992 for the expenses of the securitization. Interface has refused to remit the $1,477,992, alleging that the sale of the subordinate component of the loan to SOF–IV violated provisions of both the Loan and Revised Sharing Agreements, because SOF–IV is a competitor of Interface.[6]

Interface alleges that a tangled web of transactions—some directly related to the $141 million loan, others indirectly related to that loan—actually form the prelude to this dispute. According to Interface, its disputes with Bear Stearns have their genesis in a wholly distinct transaction: a 2002 refinancing of debt related to the Venetian Resort Hotel Casino, another of Adelson's Las Vegas properties (the "Venetian Refinancing"). According to Interface, though

---

4. The August 13, 2002 sharing agreement expressly superceded and replaced the original "Sharing Agreement," which was entered into by the parties contemporaneously with the Loan Agreement, on June 28, 2001.

5. The Revised Sharing Agreement refers to this payment as covering the costs or expenses of *securitization*. However, the fact that the Revised Sharing Agreement was consummated in anticipation of the *sale* of the subordinate component of the loan to Beal, indicates that the costs or expenses really cover the entire disposition of all loan interests, *i.e.* the August 1, 2002 securitization as well as the subsequent sale of the remaining subordinate component. Moreover, as described below, Bear Stearns only demanded payment of the $1,477,992 in excess costs related to the disposition of the loan in July 2003, upon the *sale* of the subordinate component to SOF–IV, as recounted in text. Therefore, it appears that the "costs of Secu-

ritization" could more aptly be called the costs of disposition. I note this only in passing; it is not immediately relevant to the adjudication of this motion.

6. SOF–IV is alleged to be an investment fund, Starwood Opportunity Fund, owned and managed by the Starwood Capital Group, which possesses a 75% interest in Starwood Hotels and Resorts Worldwide. Starwood Capital's president and CEO is also the chairman, CEO and a director of Starwood Hotels. Interface asserts that these relationships indicate that SOV–IV is an "affiliate" of Starwood Hotels, as defined in the Loan Agreement. Interface also asserts that Starwood Hotels owns and/or operates numerous hotels and casinos in Nevada, including the Westin Casuarina Hotel and Spa (which houses a casino), the Planet Hollywood Hotel & Casino, the Aladdin Hotel and Casino, and an unnamed Sheraton Hotel. Answer, ¶¶ 50–62.

initially included in the transaction, Bear Stearns was ultimately excluded from participation in the Venetian Refinancing. Interface avers that shortly after Bear Stearns' exclusion in April 2002, its chairman and CEO, James Cayne, notified Interface that unless Bear Stearns were reinstated into the refinancing negotiations, it would "make life difficult for Interface on the [$141 million] loan." Heller Aff. ¶ 11. Bear Stearns was not reinstated into the Venetian Refinancing negotiations. Interface contends that Bear Stearns promptly commenced a campaign of "harassment" in retaliation for Interface's refusal to reinstate Bear Stearns in the Venetian negotiations and in an attempt to be reinstated into the refinancing, Answer, Affirmative Defenses and Counterclaims (collectively the "Answer"), ¶ 38, a campaign which allegedly culminated in Bear Stearns' sale of the subordinate component of the loan to a purported Interface competitor, SOF–IV, in July 2003. Consequently, Interface claims that the sale of the subordinate component to SOF–IV, and the conduct of Bear Stearns in making that sale, constitute a breach of the Loan and Revised Sharing Agreements, thereby excusing its payment to Bear Stearns of the $1,477,992 for the expenses of the securitization.

On October 17, 2003 Bear Sterns filed suit in this Court alleging that by its refusal to pay, Interface breached the Revised Sharing Agreement and the Loan Agreement. Bear Stearns demands $1,477,992.07, as well as interest, attorney's fees, and costs. Interface filed its Answer and Counterclaims on December 2, 2003, in which it responds that the sale of the subordinate component of the loan to a competitor bars Bear Stearns' claim for breach of the Revised Sharing Agreement. In addition, Interface asserts six counterclaims alleging (1) breach of the Loan Agreement; (2) breach of the Revised Sharing Agreement; (3) breach of

the duty of good faith and fair dealing; (4) misappropriation of trade secrets; (5) prima facie tort; and (6) fraud. Interface prays for damages, costs, attorney's fees, and equitable relief.

On April 29, 2004, Bear Stearns moved for summary judgment on its breach of contract claim and to dismiss Interface's Third through Sixth Counterclaims (breach of the duty of good faith and fair dealing, misappropriation of trade secrets, prima facie tort, and fraud). In support of its motion for summary judgment, Bear Stearns contends that the alleged breach of the Loan Agreement and Revised Sharing Agreement, even if true, cannot excuse payment. First, Bear Stearns asserts that because the Loan Agreement and Revised Sharing Agreements are independent contracts, any breach of the former does not excuse a payment required by the latter. Moreover, it asserts that the breach of the Revised Sharing Agreement is not a material breach of that agreement and hence cannot support Interface's refusal to pay. In support of its motion to dismiss Interface's Third through Sixth Counterclaims, Bear Stearns argues alternatively that they are duplicative of Interface's breach of contract counterclaim, or fail to state a claim upon which relief can be granted.

## II. DISCUSSION

### A. Bear Stearns' Motion for Summary Judgment on its Breach of Contract Claim

Bear Stearns moves for summary judgment on its claim that by failing to remit payment of $1,477,992 for the expenses of the securitization, Interface breached the Revised Sharing Agreement. Interface responds that the sale of the subordinate component to SOF–IV was a material breach of both the Revised Sharing and Loan Agreements, and consequently excuses any subsequent breach by Interface.

1. *Standard of Review on Motion for Summary Judgment Pursuant to Rule 56*

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995). The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In the case at bar, the parties provided in both the Loan Agreement and the Revised Sharing Agreement that New York law would govern.

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If there is "any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party," then summary judgment should be denied. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d. Cir.1994).

2. *Allegations of Material Breaches of the Agreements*

■ "Under New York law, 'an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" *First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir.1998) (quoting *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994)). Bear Stearns' motion for summary judgment on its breach of contract claim is relatively straightforward:

> Bear Stearns has proven all four elements of its breach of contract claim. First, Interface does not dispute the validity of the Revised Sharing Agreement. Interface also does not dispute that it agreed to pay Bear Stearns the amount calculated pursuant to the formula set forth in the Revised Sharing Agreement, nor does it challenge the accuracy of the calculation. There is also no dispute that Interface has failed to pay the amount owed. Thus, Interface materially breached the Revised Sharing Agreement and damaged Bear Stearns in the amount of $1,477,992.

Plaintiff's Memorandum, p. 8. In response to Bear Stearns' summary judgment motion, Interface argues that Bear Stearns first breached the Loan Agreement and the Revised Sharing Agreement by marketing and selling the subordinate component to SOF–IV, an Interface competitor, and by failing to make a good faith effort to sell the subordinate component with the subordinate component restriction. Bear Stearns peremptorily addresses Interface's reply to Bear Stearns' allegation of breach.

> Interface cannot claim that Bear Sterns failed to perform under the Revised Sharing Agreement since ... any alleged breach of Section 3 of the Revised Sharing Agreement by Bear Stearns is

not material to Interface's promise to pay the $1,477,992. Furthermore ... since the Loan Agreement and the Revised Sharing Agreement are independent contracts, none of the breaches of the Loan Agreement alleged by Interface can affect Interface's payment obligation under the Revised Sharing Agreement.

*Id.*

■ A fundamental principle of contract law provides that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party. *In re Lavigne,* 114 F.3d 379, 387 (2d Cir.1997); *see also Medinol Ltd. v. Boston Scientific Corp.,* 346 F.Supp.2d 575, 618 (S.D.N.Y.2004); Restatement (Second) of Contracts § 237 (1981). Interface contends that Bear Stearns' antecedent breach excuses Interface's obligation to pay the $1,477,992 in securitization expenses demanded under the Revised Sharing Agreement.

In order for Bear Stearns to prevail on its summary judgment motion, it must be clear at the outset that there are no genuine issues of material fact that either Bear Stearns did not breach an agreement, or if it did, that its breach does not rise to the appropriate level of materiality to justify termination of the agreement. *Cf. Correspondent Services Corp. v. J.V.W. Investments Ltd.,* 173 F.Supp.2d 171, 178 (S.D.N.Y.2001). Put another way, if there is any evidence in the record from which a reasonable inference would support Interface's allegations of Bear Stearns' precursory material breach, such breach could discharge the obligation of Interface to pay the expenses of securitization, and Bear Stearns' summary judgment motion fails.

■ Three questions may become relevant to the disposition of Bear Stearns' summary judgment motion. First, is there a genuine issue of material fact as to whether the sale of the subordinate component to SOF–IV was a material breach of the Revised Sharing Agreement, excusing Interface's subsequent breach? If I answer this question in the affirmative I need not address the second and third questions, since the existence of that factual issue precludes a summary disposition. If Bear Stearns did *not* materially breach the Revised Sharing Agreement, then I must consider whether Bear Stearns has materially breached another *interdependent* agreement—here, the Loan Agreement—which would excuse Interface's obligations under the Revised Sharing Agreement. Consequently, the second question is whether there is a genuine issue of material fact as to whether the Loan Agreement and Revised Sharing Agreement are independent agreements? If the two agreements are independent, then I need not address the third question, because a breach of the Loan Agreement would not, as a matter of law, excuse Interface's subsequent breach of the independent Revised Sharing Agreement. Third, if the Loan Agreement and Revised Sharing Agreement are not independent, is there a genuine issue of material fact as to whether the sale of the subordinate component to SOF–IV was a material breach of the Loan Agreement, excusing Interface's subsequent breach of the Revised Sharing Agreement?

For the reasons that follow, I conclude that there are genuine issues of material fact concerning whether Bear Stearns committed a material breach of the Revised Sharing Agreement. In consequence, I need not reach the questions of whether the Loan and Revised Sharing Agreements are interrelated contracts, or whether Bear Stearns materially breached the former. Specifically, I hold that the questions of whether Bear Stearns "in good faith us[ed] diligent efforts to market and sell the Subordinate Component subject to the Subordinate Component Re-

striction," as covenanted in the Revised Sharing Agreement, and whether such an omission constitutes a material breach of that agreement, present genuine issues of material fact which preclude summary judgment in Bear Stearns' favor on its breach of contract claim.

3. *Contents of the Revised Sharing Agreement*

The Revised Sharing Agreement governs the rights and responsibilities of the parties with respect to the securitization of the $141 million loan. In his affidavit, Richard Heller, Interface's president, explained that "[i]t was our understanding that Bear Stearns did not intend to hold the loan itself, as a bank might, but rather might sell off pieces of the loan to others." Heller Aff. ¶ 3. In fact, the Revised Sharing Agreement was signed specifically in anticipation of the sale of the subordinate component of the loan to Beal, a disposition which was never consummated. Although some sections of the Revised Sharing Agreement are not implicated in the adjudication of this motion, for the purpose of comprehensiveness I briefly review all six sections below.

The first section of the Revised Sharing Agreement establishes that upon the securitization of the subordinate component of the loan both parties have fully satisfied their obligations contained in another agreement executed concurrently with the Loan Agreement: the post-closing cooperation letter. This provision of the Revised Sharing Agreement and the contents of the post-closing cooperation letter are not relevant to this motion.

The second section of the Revised Sharing Agreement provides that Interface is obligated to pay the disposition costs [7] of the loan. To that end the agreement sets forth in an appendix the costs incurred or expected to be incurred by Bear Stearns in connection with the securitization. These "disposition costs" include, for example, legal fees, fees for the rating and surveillance of the securities by rating agencies (such as Moody's and Standard & Poors), and accounting fees. The disposition costs, actual and estimated, are included in the formula by which Interface's payment obligation to Bear Stearns was calculated.

The third section, entitled "Limited Restrictions on Transfers," deals entirely with the competitor limitation. It is the longest of the Revised Sharing Agreement's six sections, comprising about one-third of the entire agreement. First, it acknowledges, but does *not* accept, Interface's request to modify the competitor limitation contained within the Loan Agreement by removing the securitization exemption. In other words, it gives voice to Interface's request that the prohibition on Bear Stearns' right to sell the loan to a competitor contained in § 10.24 of the Loan Agreement be extended so that it would also prohibit Bear Stearns from including a competitor of Interface's in the securitization of the loan. However, Bear Stearns expressly rejects this modification in the text of the Revised Sharing Agreement. Rather, this third section of the Revised Sharing Agreement provides that if the sale of the subordinate component of the loan to Beal is accomplished, Beal—as the purchaser of the subordinate component of the loan—would be required to agree "not to further sell, assign, or otherwise transfer its interest in the Subordinate Component to a Competitor" (the "subordinate component restriction"). Section 3 also provides that if the sale of the subordinate component to Beal was not successful—and, in fact, the sale to Beal was unsuccessful—the subordinate component of the loan would *not* remain subject to the competitor limitation. However,

---

**7.** My use of the term "disposition costs" is explained in n. 5, *supra.*

section 3 of the Revised Sharing Agreement does provide that Bear Stearns must "in good faith use diligent efforts to market and sell the Subordinate Component subject to the Subordinate Component Restriction," provided that the restriction does not affect Bear Stearns' ability to sell its interest in the loan. Finally, section 3 provides that "[n]othing contained herein shall be construed to permit [Bear Stearns] to transfer the Loan or any portion thereof in violation of the provisions of Section 10.24 of the Loan Agreement."

The fourth section of the Revised Sharing Agreement memorializes the parties' agreement that by resetting the spread to 3.44%, Bear Stearns has satisfied its obligation "to use commercially reasonable efforts to achieve a Final Disposition which results in the lowest Reset Spread possible." The calculation of the reset spread incorporates estimates of the disposition costs and the spreads, and, if those estimates were accurate, its payment would satisfy Interface's obligation to pay Bear Stearns the expenses of securitization.

Because some of the costs included in the calculation which yielded the reset spread were merely estimates, the fifth section of the Revised Sharing Agreement provides that if the methodology used to calculate the reset spread ("reset methodology") was based upon insufficient estimates of disposition costs or spreads, Interface would be bound to pay Bear Stearns the difference between the estimated and actual costs or spreads. It was Bear Stearns' determination that the reset methodology was, in fact, based on insufficient estimates that led to its demand for the additional $1,477,992 to cover the actual costs of securitization. Bear Stearns' determination in this regard is "binding upon [Interface] absent manifest error." [8] Conversely, if the estimates of the disposition costs assumed for the calculation of the reset spread were excessive, Bear Stearns agreed to refund the excess payment.

The sixth section of the Revised Sharing Agreement is entitled "Miscellaneous" and includes four additional provisions, none of which (except for a choice of law provision) bear directly on my resolution of this motion. First, it purports to define the Revised Sharing Agreement as an "instrument for the payment of money only" pursuant to CPLR 3213,[9] and contains a forum selection clause providing that New York law governs the rights and obli-

---

8. With respect to this motion, it is worthwhile to reiterate that the amount demanded based on the calculation discussed in the Revised Sharing Agreement ($1,477,992) is not, in itself, disputed by the parties. Rather, Interface argues that it is excused from tendering payment due to Bear Stearns' material breach.

9. CPLR 3213 provides:

When an action is based upon an instrument for the payment of money only or upon any judgment, the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint. The summons served with such motion papers shall require the defendant to submit answering papers on the motion within the time pro-

vided in the notice of motion. The minimum time such motion shall be noticed to be heard shall be as provided by subdivision (a) of rule 320 for making an appearance, depending upon the method of service. If the plaintiff sets the hearing date of the motion later than the minimum time therefor, he may require the defendant to serve a copy of his answering papers upon him within such extended period of time, not exceeding ten days, prior to such hearing date. No default judgment may be entered pursuant to subdivision (a) of section 3215 prior to the hearing date of the motion. If the motion is denied, the moving and answering papers shall be deemed the complaint and answer, respectively, unless the court orders otherwise.
McKinney's CPLR § 3213

gations of the parties. Second, it provides that should either party breach the Revised Sharing Agreement, such a breach does not constitute an "Event of Default" of the Loan Agreement. However the provision does not limit the non-breaching party's right to maintain an action against the breaching party for any breach of the Revised Sharing Agreement itself. The third miscellaneous provision requires that any modification to the Revised Sharing Agreement must be made in writing, and the final miscellaneous provision states that the revised agreement replaces and supercedes the original sharing agreement. *See infra* n. 10.

### 4. *Bear Stearns' Alleged Antecedent Breach: Good Faith Marketing of the Subordinate Component of the Loan with the Subordinate Component Restriction*

In its answer, Interface claims that Bear Stearns breached the revised [10] sharing agreement insofar as it "failed to in good faith use diligent efforts in marketing and selling the subordinate component" with the subordinate component restriction. Answer, ¶ 84; *see also* Answer, ¶¶ 49, 63–64, 83. Bear Stearns presents no countervailing evidence that it attempted to market the subordinate component with the restriction at all, let alone that it exercised "good faith" efforts to do so.

"Certainly, a party's good faith, which necessitates examination of a state of mind, is not an issue which is readily determinable on a motion for summary judgment." *Coan v. Estate of Chapin,* 156 A.D.2d 318, 319, 549 N.Y.S.2d 16 (1st Dep't 1989); *see also Zilg v. Prentice–Hall, Inc.,*

515 F.Supp. 716, 719 (S.D.N.Y.1981) ("Generally, whether a party to a contract has failed to act in good faith will be a question of fact, not to be resolved by motion unless viewing the evidence most favorably to the nonmoving party no reasonable trier of the fact could find otherwise." (internal citations omitted)); *Tepedino v. City of Long Beach,* 226 A.D.2d 446, 640 N.Y.S.2d 591, 592 (2nd Dep't 1996) ("[W]hether a party to a contract has failed to act in good faith is generally a fact question for the jury.") *Grant v. Pratt & Lambert,* 52 A.D. 540, 65 N.Y.S. 486, 491 (1st Dep't 1900) (holding that a directed verdict for the plaintiff was inappropriate where defendant claimed that plaintiff's failure to use good faith in executing its part of the bargain excused defendant's breach, because good faith was a question of fact for the jury.)

In support of its assertion that the sale of the subordinate component to SOF–IV was the culmination of Bear Stearns' campaign calculated to coerce Interface into reinstating Bear Stearns into the Venetian Refinancing, and hence was neither in good faith nor consummated following diligent efforts to sell it with the subordinate component restriction, Interface avers that:

> Bear Stearns failed to consult with Interface on the sale of the subordinate component to SOF–IV Bond Corp., failed to inform Interface of its intent to sell the subordinate component to SOF–IV Bond Corp., and failed to inform Interface of the identity of the purchaser of the subordinate component until after the sale had been consummated.

---

**10.** As explained in n. 4, *supra,* the Revised Sharing Agreement expressly replaced and superceded the original sharing agreement. While the content of the original agreement is not relevant to this motion, it is interesting to note that the original sharing agreement did not contain a single provision directly related to Interface's asserted concern that the loan not be sold to a competitor. One-third of the Revised Sharing Agreement, in contrast, is devoted to that topic.

Answer ¶ 84. Interface was allegedly informed of the sale by a half page letter, signed by a Bear Stearns' vice president and dated July 30, 2003, which simply states that "Final Disposition has occurred" and demands the additional payment of $1,477,992 for the costs of securitization due to an insufficient estimate of costs and spreads incorporated into the reset methodology. Furthermore, Interface avers that "Bear Stearns falsely represented to Interface that i) it had no knowledge of the corporate structure of SOF–IV Bond Corp., or of the identify of its ownership and affiliations, and ii) SOF–IV Bond Corp., was not a competitor of Interface." Answer ¶ 64.

Bear Stearns responds that the good faith marketing requirement of section 3 of the Revised Sharing Agreement was not a material provision of the agreement, and hence even if it did breach that provision, and it denies that it did, the breach was immaterial and as a matter of law could not excuse Interface's failure to remit payment. I address this in the next section. For the present, suffice it to say that because Bear Stearns has not alleged the existence of any facts showing that it diligently and in good faith attempted to market the subordinate component of the loan with the subordinate component restriction, it has not met its burden, as the moving party, to demonstrate the absence of a genuine factual issue concerning whether or not it breached section 3 of the Revised Sharing Agreement. However, the existence of that continuing factual issue is not sufficient, in and of itself, to defeat Bear Stearns' summary judgment motion, since the *nature* and *effect* of Bear Stearns' breach of the Revised Sharing Agreement remains for consideration.

5. *Materiality of Bear Stearns' Alleged Antecedent Breach*

   Because only *material* breaches of contract may excuse performance by the non-breaching party, there must be a genuine issue of fact as to whether Bear Stearns' alleged breach of section 3 of the Revised Sharing Agreement was material. "Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties." *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir.1997) (internal quotations omitted). Therefore, a "party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Id.*

   To be sure, there may be circumstances in which the question of materiality is a question of law for the judge. *See, e.g., Frank Felix Associates*, 111 F.3d at 284 (holding that where defendant satisfied all obligations of an executory accord, including the payment of $50,000 to plaintiff, but was twenty days late in providing plaintiff access to a computer tape drive, though when even when given access plaintiff chose to abandon the drive, the delay in making the tape drive available was not a material breach of the executory accord allowing plaintiff to collect the $412,000 owed it by defendant); *Jafari v. Wally Findlay Galleries*, 741 F.Supp. 64 (S.D.N.Y.1990) (failure to tender payment is a material breach of contract); *McDonald's Corporation v. Robert A. Makin, Inc.*, 653 F.Supp. 401 (W.D.N.Y.1986) (failure to make monthly payments as required under a franchise agreement constitutes a material breach warranting termination of the franchise).

   However, in most cases, the question of materiality of breach is a mixed question of fact and law—usually more of the former and less of the latter—and thus is not properly disposed of by summary judgment. "[C]ourts and commentators have long recognized that materiality is primari-

ly a question of fact, the resolution of which is necessarily a function of context and circumstances." *Dopp v. Pritzker,* 38 F.3d 1239, 1244 (1st Cir.1994) (citing, *inter alia,* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.16, at 443 (1990)) ("Whether a breach is material is a question of fact."); *see also Manhattan Life Ins. Co. v. Prussian Life Ins. Co.,* 296 F. 39, 42 (2d Cir.1924) (same); *Teachers Ins. and Annuity Ass'n of America v. Coaxial Communications of Cent. Ohio, Inc.,* 807 F.Supp. 1155, 1160 (S.D.N.Y.1992) ("It is for the jury to determine materiality with respect to any alleged breach."); *F. Garofalo Elec. Co., Inc. v. New York University,* 300 A.D.2d 186, 189, 754 N.Y.S.2d 227 (1st Dep't 2002) ("The question of whether there has been substantial performance—or a breach—is to be determined, whenever there is any doubt, by the trier of fact."); *Mega Group Inc. v. Halton,* 290 A.D.2d 673, 674–75, 736 N.Y.S.2d 444 (3d Dep't 2002) ("Whether promises in a contract are mutually dependent upon each other such that a failure to act by one party excuses nonperformance by the other ordinarily is a question of fact.") (citing *Greasy Spoon v. Jefferson Towers,* 75 N.Y.2d 792, 795, 552 N.Y.S.2d 92, 551 N.E.2d 585 (1990) and *Rosenthal Paper Co. v. National Folding Box & Paper Co.,* 226 N.Y. 313, 320, 123 N.E. 766 (1919); *Case Boring Corp. v. Venditti Constructors, Inc.,* 46 A.D.2d 730, 731, 360 N.Y.S.2d 750 (4th Dep't 1974)) ("How material any breach on the part of either party was, or any possible waiver of the breach, further raised issues of fact.")

Treating materiality as primarily a question of fact, best resolved by the jury, is consistent with the "wavering and blurred" line that divides the material breach from the trivial. *Jacob & Youngs v. Kent,* 230 N.Y. 239, 243, 129 N.E. 889 (1921) (Cardozo, J.). "Where the line is to be drawn between the important and the trivial cannot be settled by a formula. 'In the na-ture of the case precise boundaries are impossible.' 2 Williston on Contracts, § 841. The same omission may take on one aspect or another according to its setting." *Id.* Consequently, the law employs a "standard of materiality that is necessarily imprecise and flexible." Restatement (Second) of Contracts § 241 cmt. a (1981).

The Restatement (Second) of Contracts provides five elements to guide the determination of whether a failure to render performance constitutes a material breach:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241. The application of each of these elements requires fact-intensive analysis not appropriate for summary disposition.

In the case at the bar, there are genuine issues of material fact concerning whether Bear Sterns' alleged failure to "in good faith use diligent efforts to market and sell the Subordinate Component subject to the Subordinate Component Restriction" goes "to the root of the agreement between the parties," *Frank Felix Associates, Ltd.,* 111 F.3d at 289, and consequently is a material breach excusing Interface's subsequent re-

fusal to pay the disposition costs. The issues relevant to this determination are intensely factual. To what degree was Interface deprived of the benefit of the bargain contained in the Revised Sharing Agreement? To what extent can Interface be adequately compensated for the alleged harm resulting from SOF–IV's ownership of the subordinate component of the loan? How likely is it that Bear Stearns could cure this alleged breach? Did Bear Stearns' behavior comport with standards of good faith and fair dealing? Answers to these questions may be forthcoming after each party has a full opportunity to present their evidence. But the present record does not support this summary judgment motion. For these reasons, Bear Stearns' motion for summary judgment on its breach of contract claim is denied.

## B. Bear Stearns' Motion to Dismiss Interface's Third Through Sixth Counterclaims

Interface asserts six counterclaims against Bear Stearns, which, in turn, moves to dismiss the Third, Fourth, Fifth, and Sixth of those counterclaims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[11] In short, Bear Stearns claims that each of Interface's Third through Sixth Counterclaims are either duplicative of its breach of contract counterclaims, or fail to allege required elements of the claim.

### 1. *Standard of Review on Motion to Dismiss Pursuant to Rule 12(b)(6)*

A party moving to dismiss a claim under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted ... faces a difficult (though not insurmountable) hurdle." *Harris v. City of*

New York, 186 F.3d 243, 247 (2d Cir.1999) (citing *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995)). A purported claim "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Gmurzynska v. Hutton,* 355 F.3d 206, 210 (2d Cir. 2004). In adjudicating a 12(b)(6) motion, the Court must accept as true the well-pleaded factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff. *Harris,* 186 F.3d at 247. "The issue on a 12(b)(6) motion 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" *Woodford v. Community Action Agency of Greene County, Inc.,* 239 F.3d 517, 526 (2d Cir.2001) (quoting *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir. 1998)). In adjudicating Bear Stearns' motion to dismiss Interface's Third through Sixth Counterclaims, I may properly consider any documents attached as exhibits to the pleadings, or incorporated by reference therein. *See* Fed.R.Civ.P. 10(c); *Chambers v. Time Warner, Inc.,* 282 F.3d 147 (2d Cir.2002); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69 (2d Cir.1995) (per curiam).

### 2. *Bear Stearns' Motion to Dismiss Interface's Third Counterclaim for Breach of the Duty of Good Faith and Fair Dealing*

Interface's Third Counterclaim asserts that Bear Stearns breached the implied covenant of good faith and fair dealing by (i) coercing Interface to purchase addition-

---

**11.** Interface's First and Second Counterclaims are for breach of the Loan Agreement and Revised Sharing Agreement, respectively. While Bear Stearns does not presently move to dismiss either of these claims, their assertion by Interface is relevant to the disposition of the remaining counterclaims which Bear Stearns does seek to dismiss.

al terrorism insurance and (ii) improperly marketing and selling the subordinate component of the loan. Answer ¶ 91. Bear Stearns responds that Interface's counterclaim for breach of the implied covenant of good faith and fair dealing should be dismissed because it is "based on the same factual allegations that are the basis for Interface's two breach of contract counterclaims." Plaintiff's Memorandum, p. 6.

■ Under New York law, all contracts contain an implied agreement that neither party may engage in conduct which would interfere with the other party's right to realize the benefit of the bargain, even if such conduct is not specifically prohibited by the contract. *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 746 N.Y.S.2d 131, 773 N.E.2d 496 (2002); *Grad v. Roberts*, 14 N.Y.2d 70, 75, 248 N.Y.S.2d 633, 198 N.E.2d 26 (1964) ("Persons invoking the aid of contracts are under implied obligation to exercise good faith not to frustrate the contracts into which they have entered.... [I]n every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part."). Consequently, a party may breach the implied covenant of good faith and fair dealing even if that party's conduct does not contravene the express provisions contained within the four corners of the written agreement.

Because the duty of good faith is an implied contractual term, "breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992). Consequently, as I recently had occasion to observe, "most courts faced with a complaint brought under New York law and alleging both breach of contract and breach of a cove-

nant of good faith and fair dealing have dismissed the latter claim as duplicative." *Network Enterprises, Inc. v. APBA Offshore Productions, Inc.*, 01 Civ. 11765, 2004 WL 1837349, at *4 (S.D.N.Y. Aug.16, 2004) (internal quotations and citations omitted); *see also OHM Remediation Servs. Corp. v. Hughes Environmental Systems, Inc.*, 952 F.Supp. 120, 124 (S.D.N.Y.1997); *Canstar v. J.A. Jones Constr. Co.*, 212 A.D.2d 452, 622 N.Y.S.2d 730 (1st Dep't 1995). This is because a breach of the implied covenant of good faith and fair dealing is redundant where the conduct allegedly violating the implied covenant is also the predicate for a claim of breach of an express provision of the underlying contract. *See In re Houbigant Inc.*, 914 F.Supp. 964, 989 (S.D.N.Y.1995). In order to determine whether the breach of contract and breach of covenant of good faith and fair dealing counterclaims are duplicative, the first step is to compare the facts which underlie each claim.

First I review the allegations underlying Interface's breach of contract counterclaims. In its First Counterclaim for breach of contract, Interface avers that Bear Stearns breached § 10.25 and § 10.25 of the Loan Agreement by (i) marketing and selling the subordinate component of the loan to a competitor, and (ii) disclosing confidential information. Answer ¶ 76, 79. In its Second Counterclaim, also for breach of contract, Interface avers that Bear Stearns breached the Revised Sharing Agreement (i) by failing to in good faith use diligent efforts to both market and sell the subordinate component with the subordinate component restriction, Answer ¶¶ 83–84, and (ii) "to *otherwise*" in good faith use diligent efforts in marketing and selling the subordinate component. Answer ¶ 85 (emphasis supplied). The careful reader will notice that the latter allegation that Bear Sterns "otherwise fail[ed]" to properly market and sell the loan (in ¶ 85) is broader than the former

allegations (in ¶¶ 83 and 84), which allege failures related only to the marketing and sale of the loan *to a competitor.*

Next I review the allegations underlying Interface's Third Counterclaim for breach of the implied covenant of good faith and fair dealing implicit in the agreements. Interface alleges that Bear Stearns breached the implied covenant by (i) employing threats and harassment to force Interface to purchase terrorism insurance not required under the Loan Agreement; (ii) improperly marketing the subordinate component to a competitor; (iii) selling the subordinate component to a competitor; and (iv) failing to use its best efforts to sell the subordinate component at a fair market price. Answer ¶ 91. These factual predicates are effortlessly grouped into two categories. The first factual allegation concerns the alleged coercive effects of Bear Stearns' demands that Interface purchase additional terrorism insurance. The second, third and fourth factual allegations concern the effects of Bear Stearns' alleged failures to properly market and sell the subordinate component of the loan.

a. *Second, Third, and Fourth Factual Allegations Underlying the Third Counterclaim: Improper Sale and Marketing of the Subordinate Component*

■ The second and third factual allegations which underlie Interface's Third Counterclaim for breach of the implied covenant of good faith and fair dealing are clearly duplicative of the allegations in the First and Second Counterclaims for breach of contract. Each alleges that Bear Stearns improperly marketed and sold the subordinate component of the loan to a competitor.

Moreover, the Second Counterclaim includes the averment in ¶ 85 that Bear Stearns "otherwise fail[ed]," in good faith, to market and sell the subordinate component. As mentioned above, this is broader than the averments in ¶¶ 83 and 84, because it includes failures unrelated to the marketing and sale of the Revised Sharing Agreement *to a competitor.* The broad allegation in ¶ 85, then, certainly encompasses Bear Stearns' alleged failure to use its best efforts to garner a fair market price, which is the fourth factual allegation underlying Interface's Third Counterclaim for breach of the implied covenant of good faith and fair dealing.[12] Hence, Interface's allegation that Bear Stearns failed to garner a fair market price for the subordinate component is redundant as it is the predicate of both its breach of contract claim and its breach of implied covenant of good faith and fair dealing claim.

As such, insofar as Interface asserts that by marketing and selling the subordinate component to a competitor for less than fair market value, Bear Stearns breached the covenant of good faith and fair dealing implied in both the Loan and Revised Sharing Agreements, such claims are duplicative of Interface's breach of contract counterclaims, and must be dismissed.[13]

---

12. This fourth contention, namely that Bear Stearns' failed to garner a fair market price for the subordinate component, is not otherwise addressed, supported, or argued in Interface's submissions to this Court. Interface never explains how it would suffer injury by Bear Stearns' failure to be adequately compensated in its sale of the subordinate component to a third party.

13. Interface acknowledges as much in its pleadings. Though it proffers the four factual contentions as forming the factual predicate for its breach of the implied covenant of good faith and fair dealing, it argues in support of only one of them. "[A]t the heart of Bear Stearns' breach of its duty of good faith and fair dealing [is] the course of harassment and threats ostensibly aimed at forcing Interface to purchase additional terrorism insurance not required under the Loan Agreement of the

This disposition leaves us with only one factual contention which is not obviously duplicative of those that underlie Interface's breach of contract counterclaims: namely, that Bear Stearns violated the implied covenant of good faith and fair dealing by "compel[ing] Interface to purchase terrorism insurance on the property secured by the loan in excess of that required under the Loan Agreement." Answer ¶ 93; *see also* Answer ¶ 91.

b. *First Factual Allegation Underlying the Third Counterclaim: Coercion Relating to the Purchase of Additional Terrorism Coverage*

█ Interface alleges that in retaliation for its exclusion from the Venetian Refinancing, Bear Stearns "made repeated demands that Interface purchase insurance coverage above and beyond what was required under the Loan Agreement." Defendant's Memorandum in Opposition, p. 20. Interface does not allege that these demands breached any express provision of the agreements. Rather, it asserts that Bear Stearns' conduct, while not expressly prohibited by contract, deprives Interface of the right to receive benefits under its agreements. *See Kinsey v. Cendant Corp.*, 2004 WL 2591946, at *15 (S.D.N.Y. Nov.16, 2004) (citing *Jaffe v. Paramount Communications Inc.*, 222 A.D.2d 17, 22–23, 644 N.Y.S.2d 43, (1st Dep't 1996)). Moreover, and more importantly, Interface's assertion does not serve as a predicate for its breach of contract counterclaims, which concern the improper marketing and sale of the subordinate component. Instead, Interface asserts that different conduct—Bear Stearns' threats and harassment designed to coerce Interface into purchasing unnecessary insurance—resulted in different damages to In-

terface—monetary damages stemming from Interface's purchase of superfluous insurance coverage.

In fact, Bear Stearns largely accepts that Interface's allegation concerning the purchase of terrorism insurance is not duplicative of those which underlie its breach of contract claim. However, Bear Stearns vigorously contests Interface's contention that Interface purchased the insurance *because of* Bear Stearns' demands. Moreover, even if its demands did result in Interface's purchase of the insurance, Bear Stearns asserts that such demands simply constituted the proper exercise of Bear Stearns' authority, pursuant to § 6.1 of the Loan Agreement, to require that Interface purchase additional insurance to reasonably protect the value of the Sands Expo Center, the property which secured Bear Stearns' $141 million loan to Interface.

Bear Stearns claims that "Interface has *admitted* that it did not purchase terrorism insurance because of any demand by Bear Stearns." Plaintiff's Memorandum, p. 15 (emphasis in original). This claim is based on statements made by Interface in letters responding to Bear Stearns' initial demand that Interface purchase additional terrorism insurance. A brief recitation of the exchange of letters between the parties is in order. *See* Answer, Exs. A–F.

On May 16, 2002, Bear Stearns informed Interface because its all risk insurance coverage on the Sands property excluded terrorist acts, Interface was in breach of § 6.1 of the Loan Agreement and consequently Bear Stearns threatened to call a default of the loan. In its written response later that same day, Interface asserted that although the Loan Agreement did not require terrorism insurance, Interface "had (at considerable expense) [already] obtained terrorism coverage." Answer, Ex. B.[14] To that letter, Interface

Revised Sharing Agreement." Defendant's Memorandum in Opposition, pp. 19–20.

14. Interface also claimed "that the purpose of [Bear Stearns' May 16, 2002] Letter was not to demand that we cure an alleged default

attached documentation of the terrorism coverage. On May 20, 2002, Bear Stearns sent its reply, in which it reiterates its position that terrorism insurance is required, and further claimed that by actually purchasing terrorism insurance, Interface's "conduct suggests a recognition of the fact that the Loan Agreement requires you to purchase such insurance." Answer, Ex. C. Interface replied to Bear Stearns on May 29, 2002. Therein Interface stated: "Unless you believe that property owners only buy insurance because their lenders require it, it makes no sense to state that the fact that we purchased terrorism insurance indicates we recognize the Loan Agreement requires it." Answer Ex. D. Interface again reiterated that it had already purchased terrorism insurance prior to receiving Bear Stearns' May 16 letter.

According to Bear Stearns, Interface's admission that it purchased terrorism insurance prior to receiving Bear Stearns' letter of May 16 in addition to Interface's assertion in its letter of May 29 that it did not necessarily purchase the insurance because its lender required it, conclusively demonstrates that the insurance was purchased for reasons other than Bear Stearns' demands. If that is so, according to Bear Stearns, it would be impossible for Interface to claim damages, since it purchased the insurance prior to Bear Stearns' demands, and for reasons quite apart from those demands.

However, Bear Stearns' interpretation is clearly not the only viable interpretation of Interface's statements.

Interface's statement in the May 29, 2002 letter, concerning its motivation for purchasing terrorism insurance, was in response to Bear Stearns' allegation that Interface's purchase of terrorism insurance was an admission that Interface recognized that it was required under § 6.1 of the Loan Agreement. According to Interface, the statement in its letter of May 29 merely illustrated that factors other than an acknowledgement of the rightness of Bear Stearns' interpretation of the Loan Agreement might compel Interface to purchase the insurance. In other words, Interface's position is that it purchased the terrorism insurance not because it agreed that the Loan Agreement required it, but rather because Bear Stearns coerced Interface to buy it by threatening to "make life difficult" on the $141 million loan. Heller Aff. ¶ 11. "[W]e did obtain terrorism insurance sufficient to equal the amount of the loan, rather than provoke a confrontation, and a claim of default on the loan, by Bear Stearns." Heller Aff. ¶ 13. Both Bear Stearns' and Interface's interpretation of this statement in the May 29 letter are viable.

In addition, while Interface's letter implies that it purchased the terrorism insurance prior to receiving Bear Stearns' May 16 letter, neither the letters, the pleadings, nor the briefs establish specifically when it was purchased.[15] Neither do any of those

---

(which doesn't exist), but to continue Bear's highly improper attempts to extort us and force its way into the refinancing of the Venetian." Answer, Ex. B.

15. The insurance binders are attached as Exhibit A to the Heller Affidavit. They are dated May 16, 2002. The documents identify the covered property as "Resort, Hotel, Casino, Canal Shops Mall, Convention Center, Sands Expo." Under "Type of Coverage" there is an "X" in the box marked "SPEC," immediately

adjacent to unchecked boxes marked "BASIC" and "BROAD." Underneath is written "Terrorism Only," and identifies the coverage as "Direct Physical Loss, Business Income incl." There are two binders: one has an effective date of 4/25/02, and the second has an effective date of 8/10/02. Because they are dated May 16, 2002, but have an effective date of April 25, 2002, it is not clear from the insurance documents themselves when the terrorism insurance was actually purchased.

submissions establish precisely when Bear Stearns' first demanded that Interface purchase additional insurance. Though the first written demand was apparently made on May 16, the letters also establish that the parties engaged in verbal deliberations concerning insurance coverage requirements *prior to* Bear Stearns' May 16 initial demand. *See* Answer, Ex. B (referring to conversations between Bear Stearns and Interface the week prior to May 16). Interface clearly asserts that *"in response to* Bear Stearns' demands [Interface] purchased at great expense, sufficient terrorism insurance to cover the full loan amount." Defendant's Memorandum in Opposition, p. 20 (emphasis supplied); *see also* Heller Aff. ¶ 13 ("This additional insurance was procured solely because of Bear Stearns' demands, and would not have been procured absent the demands."). So the fact that Interface had apparently purchased terrorism by the time it received Bear Stearns' May 16 letter is also an insufficient basis for granting Bear Stearns' motion for dismissal.

Accepting as true the factual allegations and drawing all reasonable inferences in favor of Interface, as I must on this motion for dismissal, I cannot say with sufficient certainty that Interface cannot possibly prove facts which would support its contention that it purchased the terrorism insurance in response to Bear Stearns' demands.

However, even if Interface did purchase the insurance in response to their demands, Bear Stearns denies that it "could ... have breached the implied duty of good faith and fair dealing merely by demanding that Interface comply with the express terms of Section 6.1 of the Loan Agreement as reasonably interpreted by Bear Stearns." Plaintiff's Memorandum, p. 16. Bear Stearns accurately states that "[a] party has the right to enforce the terms of its contract even if that action is adverse to the other party." Plaintiff's Memorandum, p. 16. It then contends that by demanding that Interface purchase additional terrorism insurance, Bear Stearns was merely enforcing the terms of § 6.1 of the Loan Agreement, which provides in relevant part:

> [Interface] shall obtain and maintain or cause to be maintained insurance for [Interface] and the Property providing at least the following coverages: ... (ix) upon sixty (60) days written notice, such other reasonable insurance such as sinkhole or land subsidence insurance, and in such reasonable amounts as [Bear Stearns] from time to time may reasonably request against such other insurable hazards which at the time are commonly insured · against for property similar to the Property located in or around the region in which the Property is located.

Compl., Ex. 1, p. 68. The set of ellipses followed by the Roman numeral "ix" indicates that prior to the catch-all provision contained in subsection (ix), there are eight categories of specific insurance which Interface is required to maintain. None of them specifically mention terrorism insurance. Rather, Bear Stearns relies on the catch-all provision of § 6.1(a)(ix) to argue that its demands for additional terrorism insurance were simply a "reasonabl[e] request" that Interface purchase a "reasonable amount[ ]" of "other reasonable insurance." *Id.* Bear Stearns endeavors to bolster its claim of reasonableness with the assertion that at the time the parties entered into the agreement—June 28, 2001 *before* the attacks of 11 September—Interface's all-risk insurance policy contained coverage for terrorist acts. When the policy came up for renewal—*after* 11 September—the coverage for acts of terrorism was dropped. Because the coverage existed when the loan was made, Bear Stearns argues that

its demand that Interface purchase terrorism insurance is *per se* reasonable.

In its May 16 letter to Bear Stearns, Interface observed that "[t]he relevant provision of the Loan Agreement [only] requires 'all risk' insurance. As I am sure you are aware, since September 11, 'all-risk' insurance provided by U.S. insurance carriers, and the 'all-risk' insurance forms approved by the Nevada Insurance Commission, include an exception for acts of terrorism." Answer, Ex. B. In light of the rule that "the determination of commercial reasonableness is usually a factual determination best made by the trier of fact," *Leigh Co. v. Bank of New York,* 617 F.Supp. 147, 153 (S.D.N.Y.1985) (Haight, J.), Bear Stearns has not met its burden to show that Interface can prove no set of facts which would allow a reasonable factfinder to conclude that Bear Stearns' demands were reasonable *per se.*

To recapitulate: insofar as Interface's Third Counterclaim for breach of the covenant of good faith and fair dealing is premised on its allegations that Bear Stearns breached the covenant by its unreasonable and harassing demands that Interface purchase additional terrorism insurance, stemming from its anger over being excluded from the Venetian Refinancing, Bear Stearns' motion to dismiss is denied. This counterclaim is premised on different facts, alleges a breach of an implied, not express, contractual duty, and allegedly resulted in wholly distinctive damages from Interface's breach of contract claim. However, as explained above, to the extent that Interface's Third Counterclaim for breach of the covenant of good faith and fair dealing is premised on its allegations that Bear Stearns improperly marketed and sold the subordinate component of the loan to a competitor for less than fair market value, Bear Stearns' motion to dismiss is granted. This counterclaim is duplicative because it is premised on the same factual allegations which underlie Interface's breach of contract counterclaims.

### 3. *Bear Stearns' Motion to Dismiss Interface's Fourth Counterclaim for Misappropriation of Trade Secrets*

Interface's Fourth Counterclaim alleges that the transmission of "Confidential Information," to SOF–IV as part of Bear Stearns' sale of the subordinate component of the loan "constitutes the unfair and unlawful misappropriation of extremely valuable trade secrets owned and/or controlled by Interface." Answer, ¶¶ 96 and 98. The term "Confidential Information" is an invocation of the terms of § 10.25 of the Loan Agreement which contains provisions intended to protect Interface's financial information. Answer ¶ 96 (averring that Interface limited Bear Stearns' right to "disseminate the Confidential Information of Interface to others *as a condition of the Loan Agreement* ") (emphasis supplied); Defendant's Memorandum, p. 23 (acknowledging that the parties definition of "confidential information" is contained in § 10.25 of the Loan Agreement). Section 10.25 limits Bear Stearns' right to disclose "the terms of the Loan or any financial information regarding the property," proprietary customer information, or the "personal information of Sheldon G. Adelson," the Chair of Interface's Board. Compl., Ex. 1, p. 101–102; Answer, ¶ 31.

Bear Stearns responds that "[t]he Fourth Counterclaim should be dismissed as a matter of law because the allegedly confidential information allegedly conveyed to SOF–IV clearly does not qualify as 'trade secrets.' " Plaintiff's Memorandum, p. 18. According to Bear Stearns, "neither the terms of the Loan, any financial information regarding the property, proprietary customer information, nor 'any personal financial information of Sheldon G. Adelson' can qualify as trade secrets." *Id.*

Moreover, far from keeping this information secret, the Loan Agreement ensured that it would be available to any party involved in purchasing a securitization of the loan. Because I agree that the information allegedly disclosed by Bear Stearns does not constitute protected trade secrets, I grant Bear Stearns' motion to dismiss the Fourth Counterclaim.

■ A party claiming misappropriation of trade secrets must prove that: "(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990); *Restatement of Torts* § 757 (1939). Within the context of a Rule 12(b)(6) motion to dismiss, the burden falls on Bear Stearns to demonstrate beyond doubt that Interface can prove no set of facts which would entitle it to relief: namely, that Interface possessed a trade secret which Bear Stearns misappropriated.

■ By basing its Fourth Counterclaim exclusively upon a contractual provision of the Loan Agreement (§ 10.25), Interface reveals a misunderstanding of the tort of misappropriation of trade secrets. Misappropriation of trade secrets is an independent tort which is not grounded solely in the contractual relationship between the parties, but rather exists independently of the parties' contractual obligations. Restatement of Torts § 757 (1939); *see also Hudson Hotels Corp. v. Choice Hotels Intern.*, 995 F.2d 1173, 1176

(2d Cir.1993); *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990); *Heyman v. A.R. Winarick, Inc.*, 325 F.2d 584, 586 (2d Cir.1963); *Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir.1962); *Sublime Products, Inc. v. Gerber Products, Inc.*, 579 F.Supp. 248, 252 (S.D.N.Y.1984). In other words, the violation of a contractual obligation to protect confidential information does not *ipso facto* constitute the commission of the tort of misappropriation of trades secrets.[16] Hence, whether Bear Stearns transmitted confidential information in violation of § 10.25 of the Loan Agreement is largely irrelevant for the purposes of determining whether Bear Stearns misappropriated Interface's trade secrets.[17] Rather, the dispositive question is whether the "confidential information" covered by § 10.25 can also be properly called "trade secrets." Clearly here, such information is not.

■ The first step of the two-step analysis is to determine whether particular information constitutes a trade secret (the second being whether that secret was misappropriated). New York law, incorporating comment b of the Restatement (First) of Torts, defines a trade secret as a "formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Management v. Janien*, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) (quoting Restatement (First) of Torts

---

16. At the same time, and for the same reason, trade secret misappropriation can be perpetuated in the absence of any contractual relationship between the two parties.

17. This does not mean, however, that Interface is left without remedy for the alleged violation of § 10.25. Its First Counterclaim for breach of contract explicitly avers that

"Bear, Stearns also breached its obligations under § 10.25 of the Loan Agreement by disclosing Confidential Information of Interface to SOF–IV Bond Corp., a Competitor as defined in the Loan Agreement." Answer ¶ 78. If Interface can prove breach of this provision of the contract at trial it may be entitled to recover damages for that breach.

§ 757 cmt. b); *Lehman v. Dow Jones & Co.*, 783 F.2d 285 (2d Cir.1986); *Medinol Ltd. v. Boston Scientific Corp.*, 346 F.Supp.2d 575, 607 (S.D.N.Y.2004). "[A] trade secret must first of all be secret." *Ashland Management Inc.*, 82 N.Y.2d at 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007. Importantly, a trade secret is "not simply information as to single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business." *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955, 968 (2d Cir.1997) (internal citations and quotations omitted).

■ To be sure, the determination of whether a trade secret exists is often a question of fact. *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir.1999); *Medinol Ltd.*, 346 F.Supp.2d at 607 (determining whether a trade secret exists "can be a fact intensive analysis."); *Ashland Management Inc.*, 82 N.Y.2d at 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (identifying a trade secret is "generally a question of fact"). However, in some situations whether or not information is a trade secret "may be evident from the pleadings or the facts." *Medinol Ltd.*, 346 F.Supp.2d at 607. That is the situation here. The information protected by § 10.25 could be disclosed by Bear Stearns to unlimited parties in connection with a securitization of the loan, and, moreover, relates only to an ephemeral (in this case, nonrecurring) event in the conduct of Interface's business.

The information that Interface contends constitutes trade secrets is information that Bear Stearns was expressly authorized to disclose in connection with a loan securitization by § 10.25 of the Loan Agreement. Because the value of a security is derived from the periodic repayment of the underlying loans, the marketing and sale of the securities necessitates distribution of financial information concerning the underlying loans. Hence, § 10.25 expressly waives the confidentiality requirements with respect to a securitization. "Any dissemination or distribution of such information in connection with a Securitization shall not be subject to this Section 10.25." Compl., Ex. 1, p. 102. Whether or not Bear Stearns' conduct constitutes a securitization actually discharging this responsibility—though highly disputed—is irrelevant to my disposition. The result of the securitization exclusion in § 10.25 is that "countless third parties who purchased other interests in the Loan [through a securitization] are entitled to access to the allegedly confidential information." Plaintiff's Memorandum, p. 20.[18] In view of the ease with which any capital market purchaser of the security could acquire and distribute the information, such information cannot possibly fit within even the broadest interpretation of New York's definition of a trade secret. *See Ashland Management Inc.*, 82 N.Y.2d at 408, 604 N.Y.S.2d 912, 624 N.E.2d 1007.

Moreover, even if this information was actually kept secret—and was not available to any capital market purchaser in connection with her purchase of the security—it would still fall outside of the protections of New York trade secret law. A trade secret "differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business [but rather] is a process or device for continuous use in the operation of the business." Restatement (First) of Torts § 757 cmt. b. The financial information protected by § 10.25 simply cannot conceivably be regarded as a process or device for continuous use in

18. Moreover, there were not, nor could there be, any restraints on these third parties from disclosing the same information to limitless other parties.

the operation of Interface's business. Rather, the financial and loan information are independent and ephemeral facts, given limited protection by the provisions of § 10.25, and which, even drawing all reasonable inferences in Interface's favor, are not trade secrets. *Cf. Lehman v. Dow Jones & Co.,* 783 F.2d 285, 298 (1986) (holding that a trade secret is information "used in running the business ... like the formulas or processes used in manufacturing."). For these reasons, Bear Stearns' motion to dismiss Interface's Fourth Counterclaim is granted.

### 4. *Bear Stearns' Motion to Dismiss Interface's Fifth Counterclaim for Prima Facie Tort*

In its Fifth Counterclaim, Interface avers that by marketing and selling the subordinate component of the loan to SOF–IV, and by its improper demands that Interface purchase additional terrorism insurance, Bear Stearns is liable for prima facie tort. Interface's three paragraph response to Bear Stearns' motion to dismiss Interface's prima facie tort counterclaim offers feeble legal support for its counterclaim, and offers to remedy a pleading deficiency by re-pleading its counterclaim with special damages. However, re-pleading special damages cannot remedy the shortcomings of Interface's prima facie tort counterclaim, and Bear Stearns' motion to dismiss is granted.

Prima facie tort affords a remedy for "the infliction of intentional harm, resulting in damage, without excuse or justification, by an act or a series of acts which would otherwise be lawful." *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 142–43, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985) (internal quotations omitted). Under New York law, prima facie tort is often said to have four elements, with a fifth

requirement, "disinterested malevolence," usually labeled as a "touchstone" of the tort. *See, e.g., Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990); *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 332, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983). I think, however, it is more appropriate to view prima facie tort as having five elements: (1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) but with "disinterested malevolence;" (5) by an act that would otherwise be lawful.

The second element above requires that the alleged victim of a prima facie tort aver with specificity the amount of damages causally related to the tortious act. In order to state a cause of action for prima facie tort, "special damages must be alleged with sufficient particularity to identify actual losses ... round sums without any attempt at itemization are insufficient." *Curiano v. Suozzi,* 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984); *see also Fine v. Gordon, Kushnick & Gordon,* 238 A.D.2d 373, 656 N.Y.S.2d 327 (2nd Dep't 1997). In its pleading, Interface fails to allege specific damages with sufficient particularity, instead requesting damages "in an amount to be determined at trial, but no less than $1,500,000." Answer ¶ 105.[19] This is insufficient to state a cause of action for prima facie tort insofar as it fails to plead special damages. *Discover Group, Inc. v. Lexmark Intern., Inc.,* 333 F.Supp.2d 78, 87 (E.D.N.Y.2004).

But I need not base my decision on technical pleading grounds. Whether labeled as the "touchstone" of a prima facie tort or included as the fourth element of the tort, as I do, Interface fails to allege,

---

19. Not coincidentally, Interface also requests exactly $1.5 million in damages for its First, Second, Third, and Sixth Counterclaims. Answer ¶¶ 2–4, 7.

and, in fact is not in a position to allege, that disinterested malevolence is the sole motivation for Bear Stearns' actions. The term "disinterested malevolence" apparently finds its genesis in Justice Holmes' opinion in *American Bank & Trust Co. v. Federal Bank* where it was used to describe an action taken "for the sole purpose of injuring another's business." 256 U.S. 350, 358, 41 S.Ct. 499, 65 L.Ed. 983 (1921). In other words, in order to commit a prima facie tort, the tortfeasor must act with an intent "unmixed with any other and exclusively directed to injury and damage of another." *Beardsley v. Kilmer,* 236 N.Y. 80, 90, 140 N.E. 203 (1923); *see also Burns Jackson Miller Summit & Spitzer,* 59 N.Y.2d at 333, 464 N.Y.S.2d 712, 451 N.E.2d 459 ("[T]here is no recovery in prima facie tort unless malevolence is the *sole motive* for defendant's otherwise lawful act.") (emphasis supplied); *Twin Laboratories, Inc.,* 900 F.2d at 571 ("[P]laintiff cannot recover unless the defendant's conduct was not only harmful, but done with the *sole intent* to harm") (emphasis supplied). Interface's counterclaim for prima facie tort must fail as a matter of law because, as is clear from Interface's own assertions, Bear Stearns was acting, at least in part, to further its own economic interests.

Interface's prima facie tort claim rests on two of Bear Stearns' actions: marketing and selling the subordinate component of the loan to SOF–IV and making improper demands that Interface purchase additional terrorism insurance. As the Second Circuit observed, "[w]e have held that motives other than disinterested malevolence, 'such as profit, self-interest, or business advantage' will defeat a prima facie tort claim." *Id.* (quoting *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir. 1985)); *see also Brown v. AXA RE,* 02 Civ. 10138, 2004 WL 941959, at *5 (S.D.N.Y. May 03, 2004); *Melnitzky v. Rose,* 299 F.Supp.2d 219, 228 (S.D.N.Y.2004). In

consequence, if economic incentives motivated Bear Stearns' conduct to any degree, it cannot be said to have acted with disinterested malevolence, *i.e.,* with the *sole* motivation of harming Interface.

Whether or not SOF–IV is a competitor of Interface as defined in the Loan Agreement—a question I do not, and need not, reach here—it cannot possibly be said that Bear Stearns' sole motivation in selling the subordinate component of the loan to SOF–IV was to harm Interface. Economic considerations certainly play some role, if not the exclusive one, in Bear Stearns' decision to consummate the sale. In fact, Interface largely abandons the sale to SOF–IV as grounds for its prima facie tort claim in its briefs to this Court. Interface's argument identifies Bear Stearns' demands that Interface purchase additional terrorism insurance as the conduct upon which the prima facie tort counterclaim rests. However, as a matter of law this too is insufficient to support its counterclaim.

The parties vigorously dispute Bear Stearns' motivation in demanding the additional insurance. Bear Stearns contends that its demands that Interface purchase additional terrorism insurance were made simply to adequately protect the property which secured the $141 million loan. Clearly this is an economic motivation, precluding a finding of disinterested malevolence on the part of Bear Stearns. Yet, as described at length above, Interface attributes less benign incentives to Bear Stearns demands: Interface contends that Bear Stearns' demands were in response to its exclusion from the Venetian Refinancing. Even if true, Interface cannot reasonably suggest that Bear Stearns' conduct was not at least partly taken for self interested reasons, such as pressuring Interface to be reinstate Bear Stearns as a participant in the Venetian Refinancing negotiations; positioning Bear Stearns to be

included in subsequent transactions with Interface; providing leverage to Bear Stearns in further negotiations on the current $141 million loan; sending a message to other borrowers that Bear Stearns "plays hardball;" or even, as mentioned above, merely protecting its investment. Simply alleging that Bear Stearns' demands were harassing or retaliatory is not enough.

In fact, in its May 16, 2002 response to Bear Stearns' letter demanding that Interface purchase additional terrorism insurance, Interface itself makes the case that motivations other than disinterested malevolence are behind Bear Stearns' conduct: "[I]t [is] hard to draw any conclusion other than that the purpose of the Letter [demanding that Interface purchase additional insurance] was not to demand that we cure an alleged default (which doesn't exist), but to continue Bear's highly improper attempts to extort us *and force its way into the refinancing of the Venetian.*" Answer, Ex. B (emphasis supplied). In its follow-up letter dated May 29, 2002, Interface reiterates its suspicion concerning Bear Stearns' motivation. "The events of the past few weeks make it abundantly clear that your demands with respect to terrorism insurance are *not* independent of your improper attempts to have a role in the refinancing of the Venetian." Answer, Ex. D (emphasis in original). As a consequence of the foregoing, it is clear that in Interfaces's own perception, Bear Stearns was not motivated by disinterested malevolence, and Bear Stearns' motion to dismiss Interface's Fifth Counterclaim for prima facie tort is granted.

### 5. *Bear Stearns' Motion to Dismiss Interface's Sixth Counterclaim for Fraud*

■ As its sixth and final counterclaim, Interface alleges that Bear Stearns made false representations upon which Interface relied to its detriment. Specifically, Interface avers that Bear Stearns made two false representations to Interface: (i) that Bear Stearns had no knowledge of the corporate structure of SOF–IV or the identity of its ownership and corporate affiliations ("corporate structure"), and (ii) that SOF–IV was not a competitor of Interface ("competitor status"). Answer, ¶ 107. Interface alleges that as a result of its reliance on these material misrepresentations regarding SOF–IV's corporate structure and competitor status, Interface was damaged because it was deprived of an opportunity to prevent the sale to SOF–IV and to protect the disclosure of its confidential information. Answer ¶ 108.

Bear Stearns responds that Interface's Sixth Counterclaim is duplicative of its breach of contract claim: "Interface is merely recasting as fraud its claim that Bear Stearns breached the Loan Agreement and the Revised Sharing Agreement by March 21, 2005 Stearns contends that Interface's allegations of post-contract misrepresentations cannot transform a breach of contract claim into a tort claim". Because I find that Interface cannot adequately plead the elements of fraud, and furthermore cannot allege any violation of a duty independent of the contract, Bear Stearns' motion to dismiss Interface's Sixth Counterclaim is granted.[20]

---

20. Though I do not base my ruling on technical pleading deficiencies, Interface also plainly fails the heightened pleading requirements of Rule 9(b), Federal Rules of Civil Procedure. Rule 9(b) requires that "the circumstance constitute fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). As such, plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir.1996). Interface never details when or where Bear Stearns made any misleading

To state a claim for fraud under New York law "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186–187 (2d Cir.2004) (citing *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995)). In order to prevail on its fraud counterclaim, Interface must demonstrate that (1) Bear Stearns falsely represented its that it had no knowledge of the corporate structure and competitor status of SOF–IV, (2) with the intent to defraud Interface, (3) and that Interface reasonably relied on those intentional misrepresentations by not blocking the sale and thereby protecting the distribution of the allegedly confidential information, (4) resulting in damages to Interface.

With respect to the first element of Interface's fraud counterclaim—that Bear Stearns misrepresented material existing facts—Interface alleges that sometime "in August 2003 . . . upon information and belief," [21] Bear Stearns made false representations about the corporate structure and competitor status of SOF–IV. Answer ¶ 64. On this motion to dismiss, I accept this averment as true. Similarly, I accept as true that such representations, if made, could have been made with the intent to defraud Interface.

The third element of fraud requires that Interface demonstrate that it reasonably relied on Bear Stearns' alleged representations. Because Interface cannot show that it so relied, its fraud counterclaim fails as a matter of law.[22] To

statement concerning the corporate structure or competitor status of SOF–IV, nor by whom such statement was made. In fact, as stated in text, the only specific allegations relating to the statements, as detailed in Interface's Answer ¶¶ 63, 66, actually undermine its own claims.

21. The pleadings are rife with documentation and recitations of phone calls and letters exchanged between the two parties. It is noteworthy, therefore, that Interface has offered neither details nor documentation of this exchange in which Bear Stearns allegedly informed Interface's legal team that it knew nothing of SOF–IV's corporate structure and denied that SOF–IV was a competitor. Rather, in ¶ 64, Interface simply relies on "information and belief," that such statements were made to its legal team. "Conclusory pleadings 'on information and belief' are inadequate as a matter of law." *Lesavoy v. Lane*, 304 F.Supp.2d 520, 527 (S.D.N.Y.2004); *Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, 95 Civ. 8450, 1996 WL 732634, at *5 (S.D.N.Y.Dec.19, 1996) (dismissing cause of action against a defendant when the complaint contained conclusory and unsupported allegations based "upon information and belief"). In fact, Interface's only specific averments regarding Bear Stearns' statements

concerning the sale to SOF–IV may actually contradicts its claim. Two paragraphs later, in ¶ 66, Interface avers that in an August 27.2003 letter to Interface—less than one month after Interface was notified of the sale of the subordinate component—Bear Stearns' Vice President Jeffery N. "Lavine did not deny that SOF–IV Bond Corp. was a Competitor, rather, he asserted in conclusory fashion that the sale of SOF–IV Bond Corp. was a Securitization and therefore exempt from the limitations on Bear, Stearns' assignment rights to competitors." Answer ¶ 66. Because I dismiss Interface's claim on more than technical pleading grounds, however, I needn't base my decision on this patent deficiency.

22. In a fraud case, resolution of a reasonable reliance claim is generally left to a finder of fact. *Talansky v. Schulman*, 2 A.D.3d 355, 770 N.Y.S.2d 48 (1st Dep't 2003). Therefore, I do not address the question of whether Interface's alleged reliance on Bear Stearns' misrepresentations would be reasonable in light of the hotly contentious relationship between the parties for at least eighteen months prior to the alleged misrepresentations.

reiterate, Interface claims that it was harmed by Bear Stearns' alleged misrepresentations because had Interface not been misled, it could have attempted to block the sale, thereby protecting its confidential information. However, this ignores the undisputed fact that "Bear, Stearns first notified Interface of the sale of the subordinate component in July 2003, *after* the sale to a Competitor had been consummated." Answer ¶ 63 (emphasis in original). Specifically, Interface asserts that it was first notified of the sale by a letter from Bear Stearns to Interface, dated July 30, 2003, which simply stated, "[p]lease be advised that Final Disposition has occurred" and demanded payment for the $1,477,992 in excess costs of securitization. *Id.*; Compl., Ex.4. Only *after* the sale to SOF–IV was completed, in August, does Interface contend "upon information and belief" that Bear Stearns proffered misleading statements to Interface's legal team concerning SOF–IV's corporate structure and competitor status. In other words, the sale to SOF–IV was complete *before* the alleged misrepresentations were made. It is untenable for Interface to claim that they relied on August 2003 misrepresentations to make their July 2003 decision not to try block the sale.[23]

In addition, there is no evidence that Bear Stearns breached any duty independent of the duty to perform under the contract. "If the only interest at stake is that of holding the defendant to a promise," such a claim sounds in contract. *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir.1980). In order for a fraud claim to coexist with a breach of contract claim, the conduct giving rise to the fraud claim must contravene a legal duty which is "independent of contractual relations between the parties." *Channel Master Corp. v. Aluminum Limited Sales, Inc.*, 4 N.Y.2d 403, 408, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); *see also Brink's Inc. v. City of New York*, 717 F.2d 700, 704–05 (2d Cir.1983) ("A tort by a defaulting promisor is no less a tort."). To maintain a claim of fraud in such a situation, a plaintiff must either: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (internal citations omitted). None of these circumstances apply here.

**23.** In addition, Interface could not claim—and they do not attempt to claim—that they could have somehow rescinded the sale *after* its completion, but were foreclosed from doing so by Bear Stearns' alleged misrepresentations. At most, there were twelve days between Bear Stearns' notification of the sale and Interface's acknowledgment, in a letter of August 11, 2003, of their belief that the sale to SOF–IV violated the competitor limitation. Answer, Ex. G. In other words, no more than twelve days passed between Bear Stearns' mysterious and unidentified misrepresentations and the commencement of Interface's efforts to block the sale. On August 27, 2003 Bear Stearns responded in a letter in which it did not deny that SOF–IV is a competitor, but rather contended that the securitization exemption permitted the sale. *See infra* n. 21. It also accepted Interface's request—ostensibly made in Interface's letter of August 11—to meet and discuss Interface's concerns, noting that "this meeting must occur promptly." *Id.* That meeting was apparently held on September 24, 2003. Answer ¶ 68. "At the September 24, 2003 meeting, Bear, Stearns refused to take any measures to mitigate and/or rescind its improper sale of the subordinate component to SOF–IV Bond Corp." Answer ¶ 69. Hence, whether or not Bear Stearns actually made misrepresentations, within twelve days of notification of the sale Interface began unsuccessful attempts to block Bear Stearns' sale of the subordinate component to SOF–IV.

Working backwards, the damages which flow from the alleged fraud—namely whatever damages are a consequence of the sale to SOF–IV and resulting dissemination of confidential information—are precisely those damages that flow from the breach of contract claim. Interface neither claims special damages (it requests the same damages, $1.5 million, as it does for its First, Second, Third, and Fifth Counterclaims), nor could it. The alleged misrepresentation was neither collateral nor extraneous to the agreements; rather it was related and intrinsic to the contract. Finally, Bear Stearns did not occupy a position of trust or special confidence with regard to Interface that imposed obligations beyond the express agreements. *Cf. Bridgestone/Firestone, Inc.*, 98 F.3d at 20; *Lam v. American Exp. Co.*, 265 F.Supp.2d 225 (S.D.N.Y.2003) *Greenberg v. Chrust*, 198 F.Supp.2d 578, 585 (S.D.N.Y. 2002) ("[P]arties to arms length commercial contracts do not owe each other a fiduciary obligation."). Whatever duties Bear Stearns owes to Interface, it owes them as a consequence of the contract between the two parties; a breach of that duty is a breach of contract and thus is covered by Interface's First and Second Counterclaims.

Finally, Bear Stearns is correct when it asserts that intentionally false statements offered to conceal a breach of contract do not give rise to an action for fraud. Plaintiff's Memorandum, pp. 24–25; *see John Paul Mitchell Systems v. Quality King Distributors, Inc.*, 99 Civ. 9905, 2001 WL 910405, at *5 (S.D.N.Y. Aug.13, 2001); *IKEA North American Services, Inc. v. Northeast Graphics, Inc.*, 56 F.Supp.2d 340, 342 (S.D.N.Y.1999) ("[E]ven intentionally misleading statements by a defendant . . . concealing a breach of the contract do not give rise to an action for fraud."). Even if Bear Stearns did misrepresent their knowledge of the corporate structure or competitor status of SOF–IV in an attempt to conceal their breach, such misrepresentations cannot, as a matter of law, support Interface's fraud claim.

To recapitulate: Interface does not and cannot state a fraud claim because it is unable to demonstrate any reliance on Bear Stearns' allegedly misleading representations. Moreover, even Interface was able to state such a claim, it would nonetheless be redundant of and subsumed within its breach of contract claims, because there is no evidence that Bear Stearns breached any duty independent of its duty to perform under the contract. Finally, post-contractual misrepresentations offered to conceal a breach of contract do not give rise to a claim sounding in fraud. For these reasons, Interface's Sixth Counterclaim for fraud is dismissed.

### III. CONCLUSION

For the foregoing reasons:

1. Bear Stearns' motion for summary judgment on its breach of contract claim is denied.

2. Insofar as Bear Stearns' motion to dismiss Interface's Third Counterclaim for breach of the duty of good faith and fair dealing is premised on Interface's allegations that Bear Stearns improperly marketed and sold the subordinate component to a competitor for less than fair market value, Bear Stearns' motion to dismiss is granted.

3. Insofar as Bear Stearns' motion to dismiss Interface's Third Counterclaim for breach of the duty of good faith and fair dealing is premised on Interface's allegations that Bear Stearns improperly demanded that Interface purchase additional terrorism insurance, Bear Stearns' motion to dismiss is denied.

4. Bear Stearns' motion to dismiss Interface's Fourth Counterclaim for

312

misappropriation of trade secrets is granted.

5. Bear Stearns' motion to dismiss Interface's Fifth Counterclaim for prima facie tort is granted.

6. Bear Stearns' motion to dismiss Interface's Sixth Counterclaim for fraud is granted.

Counsel for the parties are directed to attend a status conference at 2:30 p.m. on Wednesday, April 13, 2005, in Room 17C, 500 Pearl Street.

It is SO ORDERED.